Filed 10/6/16  P. v. Flemons CA3

## NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C075055 |
| Plaintiff and Respondent, | (Super. Ct. No. 12F05089) |
| v. | |
| JEFFREY CHRISTIAN FLEMONS, | |
| Defendant and Appellant. | |

Defendant Jeffrey Christian Flemons was convicted by jury of three felonies, assault with a deadly weapon (Pen. Code, § 245, subd. (a)(1)),[1] criminal threats (§ 422), and child abuse (§ 273a, subd. (a)).  The jury also concluded defendant personally used a deadly weapon in the commission of criminal threats and child abuse.  (§ 12022, subd. (b)(1).)  He appeals only his conviction for criminal threats, contending the trial court

---

[1]    Undesignated statutory references are to the Penal Code.

1

prejudicially erred by failing sua sponte to instruct the jury on attempted criminal threats as a lesser included offense.  He also requests us to review the sealed transcript of the *Pitchess*[2] hearing to determine if the trial court properly denied his *Pitchess* motion.

Finding any instructional error harmless, we affirm the judgment.

FACTS

The following facts are taken from the trial testimony of various witnesses to the incident giving rise to defendant's claims.

*Paul Heston (Defendant's Neighbor)*

Paul Heston lives next door to defendant in Elk Grove.  Heston testified that, on July 27, 2012, he was in his kitchen when he heard a "[v]ery loud argument" coming from defendant's backyard.  People were yelling and cursing and "threatening back and forth."  It was difficult for Heston to hear all of the words spoken, but he did hear a male say, "[Y]ou 'F' with my family," and a male, perhaps the same male, say, "I'll cut you."  He could discern the "two loudest . . . and threatening" voices were male, with one female voice attempting to calm the situation.  Looking over the fence, he could see four people (defendant, his wife Dondra Flemons, his stepson T.Y., and another male) from the shoulders up.  Heston observed defendant and T.Y. "carrying on back and forth" while Dondra tried to calm defendant down, and could tell they were angry by the tone of their voices and because they were "moving around and posturing."  Heston also observed defendant's young daughter J.F. standing in the corner of the yard looking "very frightened."

Heston listened to the argument next door for approximately 30 seconds and called 911.  The transcript of the 911 call included the following statement by Heston:  "There's half a dozen people involved yelling and screaming.  A guy threatened to kill another

---

**2**      *Pitchess v. Superior Court* (1974) 11 Cal.3d 531 (*Pitchess*).

one.  They've got two older kids in their teens and the girl's hiding in the corner of the yard.  It's been going on for about 5 minutes."

As Heston waited for police to arrive, he stood in his living room looking out at the street.  He saw defendant come out of the house, get into a car in the driveway, and fumble around in the car.  Defendant then got out of the car and walked back to the house, holding his left hand "tight against his leg" as if he was carrying something he wanted to hide.  Soon after defendant returned to the house, the argument resumed and continued for several minutes until police officers arrived.

Heston pointed the officers to the gate to defendant's backyard.  When the officers entered the yard, Heston heard them yell, "Drop the gun" several times.

*Elk Grove Police Officer Rodjard Daguman*

On the day of the incident, Elk Grove Police Officer Rodjard Daguman was dispatched to defendant's house regarding a physical disturbance.  He and Elk Grove Police Officer Kenny Viec arrived in separate cars and were directed by Heston towards defendant's house.  As they approached, Officer Daguman heard a loud verbal altercation between approximately two people coming from defendant's backyard.  Officer Daguman walked through the gate and saw defendant, who was seated on a chair and holding a knife, arguing with T.Y., who was standing approximately 10 feet away.  Officer Daguman drew his weapon and instructed defendant several times to put down the knife.  Defendant refused, kept yelling at T.Y., and then got up and walked aggressively towards T.Y.  He eventually dropped the knife and complied with Officer Daguman's order to get down on the ground.  When Officer Daguman handcuffed defendant, he noticed defendant had red, watery eyes and emitted a strong odor of alcohol.

Immediately after the incident, Officer Daguman spoke with T.Y., who appeared "[d]istressed" and "scared."  T.Y. said he had been playing video games with his cousin when defendant came downstairs and started yelling at T.Y. and disrespecting Dondra.

3

He and defendant got into a heated argument and started pushing one another. Defendant called Dondra "all types of derogatory names" and said he did not like T.Y. and did not want T.Y. living there. T.Y. walked outside into the backyard. Defendant came outside with a knife in his hand and continued to argue with T.Y., saying, at least once, that he would cut T.Y. T.Y. feared for his life and safety because he did not know what defendant's intentions were. T.Y. confirmed that his statement to Officer Daguman was accurate.

Officer Daguman also spoke with defendant's son, D.F., who seemed sad and upset about the incident. D.F. said he was arguing with T.Y. when defendant got mad and started arguing with T.Y. Defendant came outside with a knife and tried to slice T.Y. with it. D.F. confirmed that his statement to Officer Daguman was accurate.

*Elk Grove Police Officer Kenny Viec*

Officer Viec was also dispatched to defendant's house regarding the incident. When he and Officer Daguman arrived in separate cars, he could hear the sound of a male yelling from defendant's backyard, and heard, "I'm going to fuck you up." Officer Viec walked through the gate and first saw defendant's young daughter J.F. standing behind some bushes. She was shaking and crying and appeared to be "in fear and distraught." Next, he saw defendant seated in a chair, arguing with T.Y. When Officer Viec identified himself, defendant stood up, revealing that he was holding a knife in his hand. Officer Viec drew his weapon and told defendant numerous times to stop and drop the knife. Defendant refused and said, "Fuck you. This is my house. I'm not going anywhere." He moved toward T.Y., then toward the officers. Defendant eventually dropped the knife and lay down on the ground.

Officer Viec spoke with defendant's wife, Dondra, who appeared to be scared. Dondra said she had been in the backyard cleaning a turtle tank with J.F. when defendant started yelling at T.Y. The argument got "heated" and escalated when they moved to the backyard. Defendant was being belligerent and telling T.Y. it was his house and T.Y.

4

needed to get out. Dondra told Officer Viec she knew defendant did not mean it and was just causing a scene because he had been drinking. T.Y. got upset, refused to listen, and started to walk away. Defendant went into the house, retrieved a steak knife, and came back out into the backyard. He told T.Y. to "get the fuck out or I'm going to kill you." Dondra, T.Y., and J.F. told defendant to stop, but defendant refused. Dondra confirmed that her statement to Officer Viec was accurate.

Officer Viec also spoke with defendant's daughter J.F. who was shaking and "tremoring." J.F. said she was scared for T.Y.'s safety because "she was 100 percent sure that the defendant was going to slash or stab her brother." J.F. told Officer Viec that defendant had been drinking that day and got into a fight with T.Y. over "house rules"; the argument started inside the house and continued in the backyard; defendant tends to yell and cause problems when he drinks; defendant was upset T.Y. had been living at the house for free; defendant told T.Y. he "needed to get his shit and get out of the house or otherwise he was going to kill [T.Y.]"; T.Y. was adamant he was not going anywhere because defendant and Dondra raised him since he was two years old; defendant got frustrated, walked into the house, grabbed a kitchen knife, and walked back outside and started threatening T.Y.; defendant ran towards T.Y. trying to cut him; defendant tried to jab the knife towards T.Y.'s stomach area; defendant and T.Y. were cursing at each other; during the argument, T.Y. was holding a blue milk crate to defend himself and trying to back away from defendant, making defendant even angrier; defendant tried to slash at T.Y. approximately five times in the neck as if he was going to slit T.Y.'s throat; and J.F., Dondra, and D.F. were screaming loudly. J.F. also told Officer Viec she was shaking because she thought defendant was going to kill T.Y. or slit his throat; she was so scared she stood behind the bushes fearing for T.Y.'s life; and she was scared of defendant because "every time he's drunk he acts violent" and will grab anything around him and throw it at family members. J.F. twice confirmed that her statement to Officer Viec was accurate.

5

*J. F.*

J.F. was 12 years old at the time of trial. She testified that, on the day of the incident, she was in the backyard helping her mother clean the turtle tank. Her brother D.F. (14 years old) was also there helping. Her other brother T.Y. (18 years old) was in the house playing a video game with his cousin.

At some point, D.F. went outside and did not close the door all the way. When T.Y. told him to close the door, an argument ensued and the two boys began yelling at each other. Dondra stepped in between them to try to break up the fight. Defendant came downstairs and yelled at both D.F. and T.Y. J.F. believed defendant had been drinking because his eyes were red and he was acting mad and "came out just yelling." Defendant went back inside the house and returned with a knife. J.F. was "[s]cared" and "a little worried" because she "didn't know what was going on." However, she "knew [defendant] wouldn't do anything." Defendant sat down on the chair holding the knife.

J.F. testified she was not afraid during the incident, but felt scared when the police came because they had guns and she thought they were going to shoot defendant. She was standing in the corner of the yard because "they're like screaming at each other." She did not recall anyone making any threats during the incident, or defendant running towards T.Y. with the knife. She denied telling police anything to the contrary.

J.F. testified she saw defendant stand up out of the chair with the knife. She said she saw T.Y. holding a milk crate trying to protect himself. However, she did not remember telling police defendant tried to jab the knife towards T.Y.'s stomach as T.Y. backed away holding the crate. She also did not remember telling police defendant tried to slash T.Y. five times, or that she was afraid defendant might slit T.Y.'s throat.

J.F. testified that when the police arrived, they told defendant once to drop the knife and defendant dropped it. She denied being afraid of defendant. She also denied telling police: she was afraid of defendant when he's been drinking because he acts violent; defendant and T.Y. got into a fight over some house rules; defendant gets loud

6

and causes problems when he drinks; defendant got mad at T.Y. because T.Y. had been living in the house for free; defendant told T.Y. he "needed to get his shit out of the house"; defendant said he was going to kill T.Y.; T.Y. told defendant he "wasn't going to get out of the house because he had been raised by [Dondra and defendant] since he was two years old"; defendant ran towards T.Y. with the knife; defendant tried to jab at T.Y.'s stomach with the knife; T.Y. was moving away from defendant and holding a milk crate to protect himself; defendant got really mad when T.Y. walked away from defendant; or defendant tried to slash T.Y. with the knife. J.F. further denied telling police she thought defendant was going to kill her brother; she was afraid defendant was going to slit T.Y.'s throat; she was so scared she stood behind the bushes; she is afraid of defendant because every time he gets drunk he acts violent; she thought defendant was going to hurt T.Y. with the knife; or she was 100 percent sure defendant was going to slash T.Y. with the knife.

*D.F.*

D.F. was 14 years old at the time of trial. He testified defendant was stressed about finances and had been drinking the day of the incident. D.F. and his brother T.Y. were arguing about D.F. not closing the door. When their mother broke up the argument, defendant came outside and started yelling. Defendant and T.Y. argued and yelled at each other, but D.F. could not recall what they were arguing about. D.F. denied seeing either one push or threaten the other. D.F. said defendant got a knife from the barbeque outside, "but he wasn't really going to hit [T.Y.] He was just trying to scare him away." D.F. testified that defendant just sat down in the chair and rocked back and forth, holding the knife in front of him, and also testified that defendant was holding onto the knife and "walking back and forth." D.F. saw T.Y. pick up a milk crate to protect himself, but denied seeing defendant try to hit T.Y. with the knife. D.F. also testified that when the police arrived, they yelled at defendant twice to put down the knife. Defendant complied

7

and followed the officers to the car. D.F. denied telling police that defendant tried to slice T.Y. with the knife.

D.F. further testified that defendant did not like that D.F. and T.Y. were arguing all the time. T.Y. was going to school and not working, and defendant wanted T.Y. to get a job and pay rent.

*T.Y.*

T.Y. was 18 years old at the time of trial. He testified that, on the day of the incident, he and his cousin were playing video games waiting for the barbeque for defendant's birthday. Defendant had been drinking. T.Y. told his brother D.F. to close the door and an argument ensued in the backyard. T.Y. and D.F. were yelling and pushing each other until their mother broke them up. Defendant came outside to see what was happening, but was not mad and did not say anything. T.Y. did not recall whether he and defendant argued.

T.Y. denied telling police that defendant was yelling at him and disrespecting Dondra; he and defendant got into a heated argument and started pushing each other; defendant called Dondra derogatory names and was "talking a lot of smack;" defendant said he did not want T.Y. living at home; defendant threatened T.Y. with a knife; when defendant had the knife, T.Y. feared for his life because he did not know what defendant's intentions were; or defendant said he was going to cut T.Y. T.Y. testified defendant retrieved a knife at some point and sat down in front of the barbeque to clean off the grill, but denied defendant was mad at him or made any threats towards him with the knife. T.Y. also denied he and defendant argued or he picked up a milk crate to defend himself from defendant, and denied telling the defense investigator he picked up the crate because defendant was drunk and T.Y. wanted to be able to defend himself.

T.Y. testified that, when the police arrived with guns drawn, he was scared because "they didn't say anything, so [he] didn't know what to expect." When the officers told defendant to drop the knife, he dropped the knife.

8

*Stipulated Facts*

The parties stipulated that, on October 25, 2012, defense investigator John Miles spoke with T.Y. at his home, at which time T.Y. told Miles the following: "My brother and me were outside arguing about something he had said to my mom. My mom tried to break up the fight. I think dad was upstairs. After mom broke up the fight, dad came down and we started arguing. He was pacing around and walked up the side of the house. When he came back he had the knife. [¶] At that point the police showed up. He never threatened me with a knife. I picked up the crate because he was drunk and I wanted to be able to defend myself. I don't trust anyone who is drunk. I knew my dad would never hurt me with the knife."

*Dondra Flemons*

Dondra testified that, on the day of the incident, defendant had some alcohol to drink but did not appear to be impaired. He was on the computer looking for a car. T.Y. was downstairs playing video games with his cousin. Dondra was outside with J.F. cleaning the turtle tank. T.Y. and D.F. got into an argument in the backyard over the door not being closed. The boys started yelling and cursing, and were punching and pushing each other. When Dondra got in the middle of the boys to break it up, she got hit in the face. She said, "You motherfucker," and the boys stopped and backed away. Defendant came downstairs, without a knife, to see what happened and became upset when he learned Dondra had been hit. Defendant yelled at both boys and T.Y. explained what happened. Dondra denied that defendant and T.Y. were arguing. Defendant walked to the side of the house, then returned and sat down with a knife in his hand. He was a little angry and continued "talking to" the boys, but no one was yelling. Defendant was calmly holding the knife, but was not making any kind of movements or threatening anyone with it.

Dondra further testified that, when the police arrived, defendant was still sitting in the chair. With guns drawn, the police said something like "hold" or "stop" and told

9

defendant once to get on the ground. Defendant complied with the knife in hand. He eventually put the knife down and was handcuffed.

Dondra denied telling police that when T.Y. was inside the house, defendant started to yell at him; the argument between defendant and T.Y. got "really heated" and escalated as they moved to the backyard; defendant was being belligerent and told T.Y. that "this is his house"; defendant told T.Y. he had been raising T.Y. since he was two and T.Y. needed to get out of the house; T.Y. got upset because defendant was yelling at him and walked away from the argument; after T.Y. walked away, defendant walked back into the house towards the kitchen, grabbed a steak knife and walked back to the backyard; with knife in hand, defendant told T.Y. to "get the fuck out or I'm going to kill you"; or Dondra, T.Y., and J.F. told defendant to stop and go back inside and "call it a day."

Dondra testified she spoke with the defense investigator in October 2012 about the incident. She told the investigator the argument started between T.Y. and D.F. She did not tell the investigator defendant had been drinking the day of the incident because the investigator did not ask her.

Dondra acknowledged having several telephone conversations with defendant after the incident while defendant was in jail. In the first conversation, she and defendant discussed the incident. Defendant made no mention of an argument between T.Y. and D.F. He blamed the events on T.Y. and said he could not live with T.Y. anymore. In the second conversation, they again discussed the incident and defendant, again, made no mention of an argument between T.Y. and D.F. He was angry with T.Y., said T.Y. "drove him fucking crazy," and said he "doesn't want [T.Y.] living at home." In the third conversation, they discussed the incident again. Defendant was upset with T.Y. and indicated T.Y. was going to move out. They also discussed the incident in a fourth conversation, during which defendant was "extremely angry" about the statements contained in the police report, and was "mad" about what Dondra, J.F., T.Y., and D.F.

10

told police.  Dondra had not seen the police report but, during that conversation, she repeatedly told defendant that whatever was in the report was a lie.

## PROCEDURAL HISTORY

Defendant was charged by information with assault with a deadly weapon (§ 245, subd. (a)(1)—count one), criminal threats (§ 422—count two), felony child abuse (§ 273a, subd. (a)—count three), misdemeanor child abuse (§ 273a, subd. (b)—count four), and two counts of resisting a peace officer (§ 148, subd. (a)(1)—counts five & six).  The information alleged defendant personally used a deadly weapon in the commission of counts two and three.  (§ 12022, subd. (b)(1).)

The jury found defendant guilty of counts one through three, acquitted him of count four, and found true the deadly weapon enhancement.  The jury deadlocked on counts five and six, and the trial court declared a mistrial as to those counts.

The trial court suspended imposition of sentence and placed defendant on formal probation for six years subject to various terms and conditions.  Counts five and six were dismissed in the interest of justice.

Defendant filed a timely notice of appeal.

## DISCUSSION

### I

### *Omission of Lesser Included Offense Instruction*

Defendant contends the trial court prejudicially erred in failing to sua sponte instruct the jury on attempted criminal threats as a lesser included offense of criminal threats.  We disagree.

A trial court must instruct sua sponte (i.e., on its own initiative) on the general principles of law applicable to the case; this includes instruction on lesser included offenses.  (*People v. Breverman* (1998) 19 Cal.4th 142, 148-149, 154 (*Breverman*).)  Instruction on a lesser included offense is required whenever evidence that the defendant is guilty *only* of the lesser offense is " ' "substantial enough to merit [the jury's]

11

consideration." ' " (*People v. Taylor* (2010) 48 Cal.4th 574, 623 (*Taylor*), quoting *Breverman, supra*, at p. 162.) This substantial evidence requirement is met by " ' "evidence from which a [reasonable] jury . . . could . . . conclude[]" ' that the lesser offense, but not the greater, was committed." (*Breverman*, *supra*, at p. 162.) "In deciding whether there is substantial evidence of a lesser offense, courts should not evaluate the credibility of witnesses, a task for the jury. [Citations.]" (*Ibid.*)

"[I]n a noncapital case, error in failing sua sponte to instruct . . . on all lesser included offenses and theories thereof which are supported by the evidence must be reviewed for prejudice exclusively under [*People v. Watson* (1956) 46 Cal.2d 818 (*Watson*)]. A conviction of the charged offense may be reversed in consequence of this form of error only if, 'after an examination of the entire cause, including the evidence' (Cal. Const., art. VI, § 13), it appears 'reasonably probable' the defendant would have obtained a more favorable outcome had the error not occurred [citation]." (*Breverman*, *supra*, 19 Cal.4th at p. 178, fn. omitted.) "[A] reversal will result only when there exists, in the opinion of the court, at least such an equal balance of reasonable probabilities as to leave the court in serious doubt as to whether the error has affected the result." (*Watson*, *supra*, 46 Cal.2d at p. 837.)

"[T]he *Watson* test for harmless error 'focuses not on what a reasonable jury *could* do, but what such a jury is *likely* to have done in the absence of the error under consideration. In making that evaluation, an appellate court may consider, among other things, whether the evidence supporting the existing judgment is so *relatively* strong, and the evidence supporting a different outcome is so *comparatively* weak, that there is no reasonable probability the error of which the defendant complains affected the result.' [Citations.]" (*People v. Beltran* (2013) 56 Cal.4th 935, 956, original italics.)

A defendant commits the crime of criminal threat if he or she "willfully threatens to commit a crime which will result in death or great bodily injury to another person, with the specific intent that the statement, made verbally, . . . is to be taken as a threat, even if

12

there is no intent of actually carrying it out, which, on its face and under the circumstances in which it is made, is so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat, and thereby causes that person reasonably to be in sustained fear for his or her own safety or for his or her immediate family's safety . . . ." (§ 422, subd. (a).)

A defendant commits the lesser included offense of attempted criminal threat if the defendant specifically intended to commit the crime of criminal threat, under circumstances sufficient to cause a reasonable person to be in sustained fear for his or her own safety or for his or her family's safety, and the defendant performs an act that goes beyond mere preparation and indicates that he is putting a plan into action. (*People v. Chandler* (2014) 60 Cal.4th 508, 525.)

Defendant contends he was entitled to a lesser included offense instruction on attempted criminal threat because the jury heard conflicting versions of what occurred during the incident. As defendant points out, Officer Daguman testified T.Y. said that, during an argument between defendant and T.Y., defendant came outside with a knife in his hand and told T.Y., at least once, that he would cut T.Y. Officer Daguman further testified T.Y. appeared "[d]istressed" and "scared" and said he feared for his life and safety because he did not know what defendant's intentions were. As defendant also points out, Officer Viec testified Dondra said defendant and T.Y. were in the middle of a heated argument when defendant retrieved a steak knife from the house and told T.Y. to "get the fuck out or I'm going to kill you." Officer Viec further testified J.F. said defendant and T.Y. were in the middle of an argument when defendant retrieved a kitchen knife from inside the house and threatened T.Y. with it, ran towards T.Y. and tried to cut him, jabbed the knife towards T.Y.'s stomach area, and slashed at T.Y. as T.Y. held a blue milk crate and tried to defend himself. J.F. also told Officer Viec she was "100 percent sure" defendant was going to slash or stab T.Y.

13

However, defendant argues the testimony of the two officers was contradicted by the trial testimony of Dondra, T.Y., and J.F., each of whom denied virtually every statement the police officers attributed to them, most notably that defendant and T.Y. had an argument during which defendant threatened T.Y. and T.Y. feared for his safety.

The recantations did nothing but present a stark contrast, either the defendant was guilty or not guilty of the crimes charged, not an attempt of any one of them. Clearly, the jury was convinced of defendant's guilt of the charged crime based on the testimony of Heston, the neighbor, and the two officers, along with the prior inconsistent statements made by the various members of defendant's family. Negating any doubt, defendant's wife admitted several telephone conversations with defendant about the circumstances while he was in jail. During the last one, defendant was "extremely angry" about the statements contained in the police report, and was "mad" about what his wife and the other members of their family told police.

Even if the recantation testimony by his family were legally sufficient to warrant an instruction on the lesser included offense of attempted criminal threat, it is not remotely, much less reasonably probable the jury would have reached a different result had it been so instructed.

The incident was first brought to the attention of police by a neighbor, Heston, who called 911 and reported "yelling and screaming" from defendant's backyard and "[a] guy threatened to kill another one." Consistent with that report, Heston testified at trial that he heard and saw a very loud argument between defendant and T.Y., and heard a male voice say, "I'll cut you." Although Heston could not identify which of the two men made that threat, it was undisputed that the only person at the scene in possession of a knife was defendant, and there was significant evidence defendant threatened T.Y. but no evidence T.Y. threatened anyone.

The testimony of Officers Daguman and Viec was consistent with Heston's 911 call and trial testimony. When the officers arrived, they heard the argument between

14

defendant and T.Y. Once through the gate and into the backyard, both officers saw defendant, with knife in hand, arguing with T.Y. Statements by Dondra, J.F., D.F., and T.Y. immediately following the incident uniformly confirmed defendant initiated a heated argument with T.Y. and verbally and physically threatened T.Y. with a knife, prompting T.Y. to back away while holding a milk crate to defend himself, and T.Y. and the other family members were visibly shaken by what had just taken place.

While J.F., Dondra, T.Y., and D.F. recanted significant portions of their earlier statements to police regarding defendant's threats toward T.Y., the jury was apparently not persuaded by such recantations. Indeed, the recantations of those witnesses at times contradicted their own testimony. For instance, J.F. denied telling police defendant threatened T.Y., but testified T.Y. was backing away from defendant while holding a milk crate trying to protect himself. D.F. denied any threats by defendant, but testified he, too, saw T.Y. holding a milk crate to protect himself and defendant was "trying to scare" T.Y. T.Y. could not recall at trial whether he and defendant argued, and denied that defendant threatened him or that T.Y. tried to protect himself with a milk crate. However, the parties stipulated T.Y. told defense investigator Miles he picked up the crate because he wanted to be able to protect himself even though he "knew [defendant] would never hurt [him] with the knife."

The jury was unimpressed with the recantations of testimony by the members of defendant's family. Based on all the evidence, the jury convicted him of three felonies and two weapons enhancements. Thus, even if the evidence were legally sufficient to warrant an instruction on the lesser included offense as to one of those convictions, i.e., criminal threats, the relative weight of all the evidence heard by the jury compels the conclusion there is no reasonable probability the failure to instruct affected the result. (*Breverman, supra,* 19 Cal.4th at p. 177.) Thus, any error in not instructing on the lesser included offense of attempted criminal threats was harmless.

15

## II

### Pitchess *Motion*

Prior to trial, defendant filed a *Pitchess* motion seeking discovery of the law enforcement personnel records of Officers Daguman and Viec. The trial court conducted a hearing to determine whether good cause existed for the discovery request, and ordered an in camera examination of any records "related to false reports." Following an in camera examination, the court informed defendant there were "no reports to be released."

Defendant asks this court to conduct an independent review of the sealed records of the trial court's hearing on his *Pitchess* motion. (*People v. Mooc* (2001) 26 Cal.4th 1216, 1228, 1232.) The People do not oppose the request.

We will not disturb a trial court's ruling on a *Pitchess* motion absent an abuse of discretion. (*Alford v. Superior Court* (2003) 29 Cal.4th 1033, 1039.) Having reviewed the *Pitchess* record, we find no procedural or substantive error in the trial court's handling of the motion. (See *People v. Myles* (2012) 53 Cal.4th 1181, 1208-1209.) No relevant personnel materials exist, thus there was nothing to disclose.

### DISPOSITION

The judgment is affirmed.


     NICHOLSON     , Acting P. J.


We concur:



     BUTZ     , J.



     HOCH     , J.